Palakovich Good morning. With the court's permission, I'd like to reserve three minutes. I'd like to break my argument into three parts, which correspond to the three issues before the court and, frankly, the three hurdles that my client needs to overcome to secure relief in this case. The first issue is whether or not my client's constitutional rights were violated. If the court finds that my client's rights were not violated, then the court does not need to proceed to what I consider the thornier habeas issues of exhaustion and the deferential standard of review inquiry. I believe the preliminary answer to the question whether my client's rights were violated is a resounding yes. It's what the district court found. It's what the magistrate found. And I believe once we've explored those issues a little here, I think this court should find that as well. The second issue is, was the district court's ruling on exhaustion correct? I believe the preliminary answer there is also yes. My opponent generally cites cases that impose a more precise exhaustion requirement, and those cases were largely decided after the relevant time period here. The relevant time period being when my client's state court counsel on direct appeal drafted and filed his superior court brief. What was the rule on exhaustion at that point? And as I'll get to in a moment, I think that the rule was a lot less stringent than it is today. And the third issue is whether or not the district court erred in finding the comments of the prosecutor here unlawful, but going a step further and saying that no relief was due despite that violation of law on the basis which I consider incorrect, on the basis that the evidence at trial was somehow strong and independent. I'd like to eventually get to the part where, in my argument, where I can pretty easily describe to you why the evidence in this case against my client was not independent and was not strong. It was a one witness homicide case. The one witness was a friend of the complaining witness, and that one witness did not even see what happened when the first five shots were fired at the scene of the crime. And I think that that's going to become a pretty important question. With respect to the first issue before the court, and whether or not the remarks of the prosecutor here were improper, I'd like to remind everybody that the district court did find that the remarks were improper. The specific subject area that the district court found was improper dealt with the trial prosecutor's argument to the jury that the jury should come back with a guilty verdict. In order to protect the lives and safety of the brave witnesses who came forward to testify against my client. Only a guilty verdict will protect them, he said, that they're scared to go out of their houses and take their kids to school. They're scared of what might be fallen by coming into court and testifying. First of all, there's no evidence in the record to support any of those comments, but be that as it may, the state court did not even address that part of Mr. Walker's state court appeal. State court just left that one blank. In applying the deferential standard of review under AEDPA, I believe and submit to this court that the district court was in error in finding that despite the fact that that was unconstitutional, that that was a violation of my client's due process rights. That we're not going to grant relief because of the testimony of Mr. Lorenzo Andrews. I submit to this court that the district court did not account sufficiently for the actual facts of what took place at trial. This was a shootout outside of a shop. And only one witness testified for the Commonwealth from the witness stand to the events that resulted in the victim's death. And he said that he was a friend of the victim, which therefore makes him not so independent. And he testified that I did not see the first five shots fired. So we didn't see how the shootout began. On top of that, there was independent prosecution evidence from the police that there were at least three and at most five guns present at the scene of the crime. My client was shot himself. The Commonwealth witnesses testified that the victim had a gun, a nine millimeter gun. And the ballistics proved that there were at least 24 to 30 shots fired at the scene because there's that many fired cartridge cases that were found at the scene. But we don't know which person shot him in the back because there were at least three guns there, which would suggest the presence of three people. Well, whoever shot him in the back, it would not appear to be self-defense, would it? Except that we don't know what happened with those first five shots. Those first five shots could have been the victim shooting at my client because after all, my client got shot and ended up in the hospital. So we don't know how those first five shots came. It could have been the victim shooting at my client and then my client turning around to shoot back while that man was running away and therefore got shot in the back. I thought Andrews testified that he never saw a weapon in the victim's hand and that the victim was falling to the ground as Walker was shooting. Mr. Hale and Mr. Pierce, which were the Commonwealth witnesses in this case, testified that the victim did have a gun in his hand. So there's a dispute in that testimony on that point then. So the reason why that's important, all those facts, is because Mr. Andrews' testimony then, while it's certainly important in helping the Commonwealth sort of try to make out some of the elements of the case, doesn't disprove self-defense. Because he doesn't see how the shootout started. And so we can't sit here and guess today how the shootout started. So as a result of that, the evidence at trial was not so strong to implicate my client in a criminal offense. And as a result of that, I would argue that the district court erred in not taking enough account of those facts. Those were important facts. Is it correct, the improper vouching by the prosecutor, is it correct that this was never raised before the Superior Court of Pennsylvania? I believe that is correct, Your Honor. Okay. So that would be procedurally defaulted. As unexhausted. No longer. Well, and no longer can be exhausted. Correct. My client no longer has a remedy in state court at this point. There is one other comment by the trial prosecutor, however, that was exhausted in state court that ties in very closely to this fear of witnesses argument that the prosecutor made. And that's the argument that Philadelphia is a crime-ridden city where homicide is the order of the day. And the district court found that that constituted some sort of fair response to the defense attorney's closing argument in which he accused the police detectives of doing sloppy police work. Well, I would submit that that doesn't really make much sense to me. It seems to me the fair response to an argument that the police were sloppy is to argue the facts that demonstrate that the police were not sloppy, whatever those may be. It's not to say that we live in a crime-ridden city where homicide is the order of the day because then that becomes an appeal to the jury to convict this one person in order to address the rampant crime problem in the city. And therefore, the state court's resolution of that particular claim, specifically that that prosecutor did not stray too far from the evidence, doesn't make much sense. I don't know how much further you can stray from the evidence than to say convict a defendant in order to address the rampant crime problem in the city. Finally, I'd like to address the exhaustion argument that my opponent spends a great deal of time in his brief. Let me go back to one other thing with respect to what the superior court said. And this goes partly to what you said about the certain comments by the prosecutor. The court said it becomes obvious to this court that the purpose of the prosecutor's argument was not to incite sympathy on the part of the jury because appellant was dangerous, but rather to explain why the witnesses to the crime signed written statements for the police and then later recanted those statements on the witness stand. Why was that improper? Why was the superior court improper? It was improper because, and objectively unreasonable, which is my standard that I need to meet, because the witnesses that testified never testified that my client, that they had been threatened by my client or were scared of my client or had anything to do with my client. Was it a reasonable inference? No, sir. Okay. If people gave written statements implicating the defendant and then recanted on the witness stand? Judge, I just ask the court to sort of almost take judicial notice of the sort of problem we have in Philadelphia today with reluctant witnesses coming forward. They are reluctant for a lot of reasons that have nothing to do with specific threats perpetrated by the defendant on trial. Since there was no evidence in this case that my client did anything. In fact, there was affirmative evidence by both of those witnesses that they said that my client did not threaten them. There was particular evidence going the other way. So I think that pretty much directly addresses the court's concern. With respect to exhaustion, very quickly, state court counsel did not do a great job of exhausting the federal claim. I'm not going to stand here and try to say he did a wonderful job. It's not great. But the magistrate found that it was exhausted. The district court had no problem finding it was exhausted. And they found that it was exhausted based on the language that was used, that it was substantially equivalent to a federal due process claim, that the state law that was used to resolve the claim when raised in state court is substantially equivalent, if not precisely the same as federal law. And the cases that my opponent cites, primarily Baldwin v. Reese, which is the U.S. Supreme Court case that stands for the proposition that federal judges, excuse me, state judges are not under some obligation to scour the state court record to find the federal basis for the claim, that the litigant has some affirmative obligation to cue the state court judges that a federal claim is being asserted. That that was decided several years after the relevant time period in this case. And that at the time that the state- We'll give you five more minutes. Thank you, Your Honor. At the time the state court brief was drafted, which was 1998, late 1998, the law was not as settled as it is today, post-EDPA, where the U.S. Supreme Court has, correctly cited by my opponent, come down on the side that litigants must now be more precise. But in 1998, they did not need to be that precise. And I would submit that what we've seen over the past seven or eight years is a tightening up of the exhaustion requirement, as well as every other hurdle that a habeas petitioner must overcome. There's been a tightening up, and that wasn't the case back in 1998. But certainly, if you read the brief, there is nothing to lead you to consider that this is a federal claim. Except what the district court and the magistrate found was sufficient to satisfy the exhaustion requirement. The language that was used, I think it was something like the outrageous violation of the law. The state cases that are cited, one of them, Commonwealth v. Gilman, does rely on federal law. But do you have to read the cases cited? Under Baldwin, which was decided subsequent to the relevant time period here, the answer is yes, you do have to give the state court more of an indication. But at the time, they did not. I would respectfully request that the court reverse the district court's judgment that the state court's opinion was sufficiently reasonable on the issue of prosecutorial misconduct, having found that my client's rights were violated. Thank you. I'm sorry, hold on a second. Mr. Silverman, one question, and really the ultimate question here. You went through these in, I think, three very concise and proper steps. You're familiar with Darden v. Wainwright, with that case? It's a due process case, yes. Vaguely. But considering that case, how can you say that the Superior Court unreasonably applied, clearly established law, when there the misconduct was less severe, strength of the case was about the same, but they found that the misconduct did not violate the defendant's due process rights? I'm assuming, Your Honor, without knowing, but I'm assuming that in Darden the state court at least addressed all of the prosecutorial arguments that were alleged to be violative of the defendant's constitutional rights. In this case, the state court did not. The state court simply ignored, omitted any discussion of certain of the remarks that the prosecutor made that we submit were improper. But I said assuming. Assuming that all remarks were improper. How can you distinguish this case from Darden? Well, I would first submit that under habeas law, if the state court ignores the federal claim, that that's objectively unreasonable unto itself. It's clear here they didn't ignore the federal claim. They may not have considered, or they may not have found, that all of the comments were prosecutorial misconduct. As the district court found. But you can't make the argument here that they ignored the federal claims. Well, they ignored the claim that the prosecutor argued to the jury that it should return a guilty verdict in order to protect the brave witnesses who came forward. And that it's important that what stands between what might befall these brave witnesses is the jury. The state court did not address that. So I would stand with that remark. But I would also add that here you have a prosecutor that engaged in what I submit were three different subject areas. The vouching, which was not exhausted. The fear of witnesses argument. And the crime-ridden city, rampant crime-ridden city argument. He engaged in all three. He repeatedly ignored the sustaining of objections by the trial court. Repeatedly. Just kept on, just plowed right forward as though it didn't matter. And I'd ask you to sort of put your foots down and say, well, no, it does matter. And he also ignored the rather mild cautionary instructions that the trial court gave. So I would posit those as distinctions from Dorn. All right. Thank you. One other question. I think this was a pre-administrative order 218 case. You filed a, on direct appeal, you filed a petition, you, the defendant filed a petition for allowance of appeal to the Pennsylvania Supreme Court. But I've been unable to locate that petition. Maybe the Commonwealth has it. And my question is this. Is it, do we know for sure that prosecutorial misconduct was raised in the petition for aliquot or to the Pennsylvania Supreme Court? I don't know. Okay. We don't, I don't know either. Good question. Good. Any other questions? Mr. Silverman, thank you very much. We'll have you back on rebuttal. Mr. Gleeb. Good morning. Good morning, Judge Sirica. Good morning, Judge Roth. Good morning, Judge Fisher. May it please the court, my name is David Gleeb. I'm from the Philadelphia District Attorney's Office, representing the respondents and the appellees in this habeas appeal. And the case essentially presents two types of questions, a procedural issue and a merits issue. And I think the parties have done a fairly exhaustive job, no pun intended, of covering those issues. And I'm glad the court, Judge Sirica, I'm glad you pointed out in particular something that I didn't stress, and I could have stressed better in my own brief, which was that when you look at the exact claims, the exact, there's an overarching prosecutorial misconduct claim, but it's broken down into several sections. And it was certain sections of that were presented on the state level and certain were also presented to the district court. But a couple of them simply are missing. And I'm glad that we're kind of beyond that at this point, that the claims about vouching that Mr. Silverman's raised simply aren't on the table here. They weren't in the state court's record at all. And I apologize to the court for not more clearly pointing that out. My position. Do we know what was raised on Allocounter? Your Honor, I was looking in my own notes as you were asking the question to Mr. Silverman. I know that there was a petition for Allocounter filed and it was denied December 28, 1999. I would be happy to try to find whatever was filed. I think that would be helpful to know because it obviously would be significant if it were not raised. If I could look into that and get back to the court, I'd be happy to do that in a brief letter to the court. Your Honor, I'd be happy to address either the procedural issues or the merits issue as the court would. No, go ahead. Do both. As far as the procedural issue goes, I think I agree with Mr. Silverman that to some extent the Supreme Court of the United States has clarified and I think tightened up the exhaustion rule in the Baldwin case and the Howell case, which I've cited in the briefs. But the exhaustion rule in itself is an old rule. It goes back over a century, back into the 1800s. It's a very straightforward one, simply that before you present a federal claim to the federal court, you have to present that federal claim to the state courts. You have to do it in a straight-up manner. You can't hide it. Then, of course, in the jurisprudence that has developed over the years, you have basically two classes of cases on exhaustion. You have the cases where it's clear that the federal claim was exhausted in the state court because it's presented straight up. Then you have the other class of cases where you have to kind of look and decide, well, is it really the same claim? And I think those are the kinds of cases that the Supreme Court is now looking at and saying, look, it's a very easy requirement. Present your federal claim to the state court. And in this case, my argument is that it really wasn't. None of the claims, none of the prosecutorial misconduct claims were presented as federal claims. And they could have easily done so, even though it was in 1998 or 1997, whenever it was. And two of them, I'm glad we're all in agreement, simply were not even mentioned at all. So those, we also agree, are not exhausted. And since it's too late to go back now, they are procedurally defaulted. I haven't heard anything from Mr. Silverman about whether the default should be excused on cause or prejudice grounds or on misconduct of justice grounds. So, essentially, those are unreviewable. As to the remaining claims, I can see how the magistrate and the district court could want to look at the case in a substantive way and say, well, we're not just going to use this procedural technicality to get around. If there's an argument to be made that a federal claim was suggested on the state court, we will give them the benefit of the doubt. And that's common. We see that in a lot of cases. I'm urging the court, or the Commonwealth is urging the court, to look at this case and look at the precedential value of its own case and how this case should add to federal jurisprudence and be consistent with it or not. And the question I'm asking the court to consider is when the federal courts are looking at the exhaustion rule, should it basically tighten up that rule or should it loosen the rule? And we're saying that this court should essentially follow what the Supreme Court has been doing and say that the exhaustion rule is very simple and very plain and very straightforward and all it requires is a simple identification to the state courts. Here's a federal claim. This is what is being presented as a federal claim. And so we're asking the court to essentially take that approach. Is our standard in McCandless v. Vaughan, has that been limited by the Supreme Court's decision in Baldwin? Your Honor, that's a good question, and I know the court in NARA I think last year addressed that, and I think this court, I can't remember which judge of the court wrote the NARA opinion, maybe I think it was Judge Nygaard, specifically said that McCandless was not narrowed by the U.S. Supreme Court's decisions in Baldwin and in Howell and in similar cases. I would disagree. I think that looking at all of those cases, it seems that the McCandless test for exhaustion seems to say that the court should freely simply go beyond the pleadings, should read into them, should liberally or charitably interpret them. That might actually not be a bad idea if you're dealing with a pro se case. This was not that. And so maybe a caveat to my own position to the court. But how free are we to change McCandless if you are, are you urging us to come to a decision that would be inconsistent with McCandless? Your Honor, I would simply say that McCandless was decided before the Supreme Court's most recent opinions on exhaustion and that this court, in looking back at what kind of precedents and what kind of principles to apply, of course is more obviously bound. Now you're saying there is an opinion saying that McCandless is not affected by Baldwin. That's the NARA case. That's an observation of this court in NARA. Right. And aren't we bound by that? Well, Your Honor, I think in a sense you're bound by all of them. I'm asking the court simply to look at it and to look forward and to look at its own, essentially look at your own precedents and look at the Supreme Court's precedents. I mean, I can see exactly the way Mr. Silverman is arguing the case that Baldwin and Howell from the Supreme Court essentially could be limited to their facts and could be seen in a way that's not broad. It doesn't, and does not tighten up the exhaustion requirement. And this court could easily do that. I mean, I think the Supreme Court has, in fact, I think the court in Baldwin left open the issue of whether there's a coextension, whether you have a group of claims such as you have here that aren't identified specifically as federal claims, but they have the same kinds of standards as federal claims. They're not identified specifically. I think that may be an open question. I think my impression is that Baldwin and Howell moved towards that direction that says, no, they have to be the same. They have to be identified as the same. And the reason for that is simple. It's simply because the state courts, under principles that go back over 100 years, the state courts have to be on notice. They have to have the claims presented in a straight-up fashion so that they can opine about that claim. And when you have claims as here, they're presented simply in terms of state law, state cases, and nothing else, not even a mention, not even the magic words, as Judge Slovar sometimes mentions, not even the magic words, the federal due process, which is sometimes thrown in. That's not even here. If that's the case, it simply doesn't seem to be a burden on the defendant. The jurisprudence is fairly clear that the exhaustion burden is and has always been on the claimant, and it's not a heavy burden. And so we're saying simply for the court to consider all of those factors. As far as the merits go, if the court gets to the merits, if it adopts the district court's opinion to that extent, as I've argued this case with Mr. Silverman over the years in front of the district court, it's almost as if we're talking about two cases. And I think there's a strange or an unusual aspect to this case in that you have certain witnesses who are testifying at trial that contradicted something that they said before to the police. And then you have the prosecutor in the situation of trying to make sense of that to the jury because exactly how does the prosecutor make sense of that? Do we simply ignore? It seems that the argument I've been seeing from Mr. Walker's side is that we can simply ignore the fact that two of the witnesses, two of the three main witnesses for the Commonwealth, gave fairly strong statements to the police, incompletory statements against Mr. Walker. One of them, Mr. Andrews, who testified he actually saw the shooting itself, there's really nothing that they can say to get around his particular testimony except that maybe he didn't see the entire shootout. His testimony, I think, is very strong, though. And I think there's actually something that struck me as I was preparing for this argument in Mr. Andrews' testimony I'd like to call the court's attention to. I probably should have done this also in my brief. I apologize for doing that. It's at page 23 of the testimony on July 2, 1997. Mr. Silverman has continually said that there's no evidence in the record about the so-called fear of the witnesses that ties that fear, if there was any such fear, to Mr. Walker himself. But when you look at Mr. Andrews' testimony, Mr. Andrews who knew Mr. Walker and who knew the victim, he's describing exactly what happened when Mr. Walker came into the barbershop, kind of confronted some, basically saying or calling out Mr. Hamlin, the victim, and saying there's something here we've got to talk about, and everyone else was saying take it outside. And Mr. Andrews says, he wants to go with his friend, he says I stopped before I even got out there because, I mean, he just kicked the door open, he meaning Mr. Walker, and we didn't know where he came from or nothing, so I stopped. He said I got out, I looked both ways before I stepped out, and I seen a white, this is his testimony, the prosecutor, says why did you feel it necessary to look both ways before you went out the barbershop door? And here's Mr. Andrews' response, I went to school with Gary Walker, I know Gary Walker. Question, now when, did you check both ways? Answer, yes, I did. Question, after you checked both ways, did you feel it was okay to go outside? Yes. So here's something that hasn't been looked at, it's in the record in the court's review, if it gets to that point, but here's Mr. Andrews, besides Mr. Hale and Mr. Pierce, Mr. Andrews indicating he has some fear of Mr. Walker. This is before the shooting even takes place. So the idea that there's no evidence whatsoever in the record that ties any kind of fear or intimidation by the witnesses to Mr. Walker is simply not the case. What about Hale and Pierce? Your Honor, I think for Mr. Hale, I think his statement to the police, which I don't have right in front of me, I think that it's right in his cross-examination. Mr. Hale specifically said, I was giving, I gave a certain statement to the police and I'm taking it all back when he was on the stand. The prosecutor confronted him with his police statement and in his police statement he said, look, I'm afraid of these guys. I have to live here. He said something like that. Now that, unfortunately for Mr. Silverman, that was in the record. The jury could consider that. It's not as if the jury could not consider that and that's the unusual part of this case is you have these witnesses saying two things, but you have the jury able to consider both. As far as Mr. Pierce goes, his any kind of expression of fear, I can't really pinpoint it. I don't think there was as clear an expression as Mr. Andrews and Mr. Hale expressed, but there was something he also testified about and he told the police about in which he could infer it pretty clearly. He said, this happened just as I was getting ready to go and pick up my daughter from school. And so instead I had to make other plans. I had to call somebody to get somebody else to pick up my daughter. Now that's not flat out coming out and saying, all right, now I'm afraid of what happened and I'm afraid of cooperating with the police, but it's something you can infer. It's definitely something that's implied for that. Here I live in a neighborhood where I'm hearing gunshots  In essence, your argument is that none of the comments made by the district attorney at the closing argument constituted prosecutorial misconduct. Your Honor, that's correct. And I think one of the things the court has to do is in applying the correct standard, if you get this far, you have to look at not only what the prosecutor said, but what the defense counsel said. I see my time is up. No, no, we'll give you five minutes. Thank you, Your Honor. You have to look at what the defense counsel said and what the prosecutor said. You have to look at the strength of the overall evidence, which in this case was strong, and you have to look at the degree of the misconduct itself. Now, I have to admit, in reading this record, this prosecutor was a very passionate prosecutor. He made comments that probably went close to the line. There's no... you read the case. But he was being personally attacked. He, even himself, named by the defense counsel from the beginning. It's very interesting to read the defense counsel's opening or his summation first, because he says something, and this is another one of those things where it jumps out at you, and I wish it had jumped out at me before I wrote my brief. He says something like, not only was the police work sloppy, sloppy, sloppy, but he tells the jury, if you only knew what went on at the DA's office, basically implying that there were all kinds of background shenanigans going on. He says that. He says, well, we all know there's a whole lot of problems with the Philadelphia Police Department. We all know there are bad apples who do bad things all the time. All of this, one after another, one comment after another. And so when the prosecutor got up, what was the prosecutor supposed to do? Was he not supposed to respond? If he didn't respond, he would have given the jury the impression that, well, that's okay. I agree with all that. I concede. Yeah, there were all these problems. Yeah, these were bad cops, et cetera. So we're saying that there was no violation of Mr. Walker's constitutional rights. There was no comment or set of comments by the prosecutor that when taken together violated due process, were taken together so that they actually resulted in prejudice. I call the court's attention to, Judge Fisher, you mentioned the Darden case. I think this court's opinion in Moore v. Morton, which I was rereading this morning, is a good comparison case. Because in that case, this court did find prosecutorial misconduct. And I think in looking at the two, looking at the standards that were applied there and the standards that are applied here, I think that it's a nice contrast. Because the conduct at issue here is just nowhere near the conduct in Moore. And also you have the same EDPO deference standard in Moore also. So I would ask the court to consider that case. Any other questions? Thank you very much. Thank you. Mr. Silverman? Three very brief points. In Baldwin, the U.S. Supreme Court did, in fact, explicitly leave open the question whether if the state standard in Baldwin was an ineffectiveness standard, if the state standard is precisely the same as the federal standard, whether or not the failure to cite explicitly the federal standard would nonetheless exhaust the claim. The reason the U.S. Supreme Court did not reach the issue in Baldwin is because Petitioner's Counsel didn't preserve it. I forget exactly what happened. He didn't raise it in his briefs, but wanted to argue it in an oral argument or something like that. And in this case, the reason that's analogous here is because the federal due process standard is the same as the state due process standard. And I would submit that at least under the existing law of Baldwin, I can still stand here with a straight face and say that because the standards were the same, my client's state court's lawyers attempt to argue a due process violation since the standards are the same, exhausted the federal claim. Number two, Mr. Glebe seems to, is trying to kind of bolster the evidence against my client and saying that the evidence against him was strong by referring to Mr. Hale and Mr. Pierce's police statements, and that here we have two police statements in which these witnesses at least at one time implicated Mr. Walker. Well, there are a few things to say about that. Number one, the witnesses themselves, Mr. Hale and Mr. Pierce, testified that they repudiated those statements. They said the police roughed them up, that the police suggested what they should be saying, and they suggested who to identify. If the Commonwealth is allowed to stand here and say our case is strong because of these police statements, then I'm allowed to stand here and say, well, you should also take into account why they said what they said. And they said that they repudiated those statements because the police roughed them up. In addition, I would submit that under Crawford v. Washington, the U.S. Supreme Court's case from, I think it's 2004 or so, those police statements are not even admissible any longer because they weren't given under former testimony, under the former testimony exception to the hearsay rule. So I don't think that my opponent gains a lot by trying to bolster his case by referring to those two police statements. And thirdly and finally, I would simply say that, you know, a little common sense here, I think, would suggest that the reason a prosecutor resorts to misconduct in a closing argument and crosses the line is because he knows that he has a weak case. That's why they do it. If they had a strong case, then there's no reason to cross the line. And I submit to you that's what the trial prosecutor did here. Thank you. Any questions? Were you a pro bono appointee? On this case, Your Honor? Yeah. No, it's privately retained. Oh, okay. Good. Mr. Solomon, thank you very much. Thank you, Your Honor. We thank both counsel for a very helpful argument. The matter will be taken under advisement.